UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

TADEUSZ DANIELAK,

                Plaintiff,

    -against-

CITY OF NEW YORK, SERGEANT REILLY,
POLICE OFFICERS JOSEPH REZNICK,
SHIELD # 17468, STEVEN ZANETIS,
SHIELD # 4228, FRACCALUIERI, LEWIS,
DICKENS, AND UNIDENTIFIED NEW YORK CITY
POLICE DEPARTMENT OFFICERS,

                Defendants.

-------------------------------------------------------------------- X

**MEMORANDUM & ORDER**

02-CV-2349 (KAM)

**KIYO A. MATSUMOTO, United States Magistrate Judge:**

        Upon the consent of all parties, this case has been referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, to conduct all further proceeding in this action, including the trial, and to order the entry of a final judgment. Docket no. 55, Letter from Tadeusz Danielak Consenting to Reassignment, undated; docket no. 56, Stipulation Consenting to Jurisdiction by U.S. Magistrate Judge, dated May 3, 3005; docket no. 58, Notice of Reassignment, dated May 4, 2005.

        On April 18, 2002, plaintiff Tadeusz Danielak ("plaintiff") commenced this civil rights action against defendants City of New York (the "City"), Sergeant Michael Reilly, Police Officer Joseph Reznick, and Unidentified New York City Police Department Officers, alleging claims under 42 U.S.C. § 1983 ("section 1983") for alleged violations of his Fourth and Fourteenth Amendment rights, as well as state law claims for negligence. See docket no. 1,

Complaint. On August 7, 2003, plaintiff filed an amended complaint against the City; and defendants Michael Reilly, Joseph Reznick, Police Officers Steven Zanetis, Gregory Fraccaluieri[1], Daniel Lewis, Martin Dickens, and Unidentified New York City Police Department Officers, (collectively, the "defendant officers"), alleging claims under section 1983 for violations of his Fourth and Fourteenth Amendment rights, as well as state law claims for negligence, false arrest, false imprisonment, abuse of process, slander, libel, malicious prosecution, intentional infliction of emotional distress, trespass, invasion of privacy, failure to intervene, and property damage. See docket no. 16, Amended Complaint ("Am. Compl."). Plaintiff also alleges that defendants conspired to violate his constitutional rights, and that the City negligently hired, retained, trained, supervised, and disciplined its employees[2], more specifically, the defendant officers.

The City and the defendant officers (collectively, "defendants") now move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing all

---

[1]Although he was sued as Fraccaluieri, this defendant answered as "Fraccalvieri." See docket no. 20, Answer to Amended Complaint by Fraccalvieri. For consistency, this defendant will hereinafter be referred to as "Fraccalvieri."

[2]By letter dated March 30, 2004, plaintiff's former counsel acknowledged to defendants' counsel, *inter alia*, that plaintiff's negligent hiring, retention and screening; slander (and presumably libel); trespass; property damage; abuse of process; and negligence claims were not viable. In addition, plaintiff's former counsel acknowledged in the same letter that plaintiff did not have viable state law claims against Fraccalvieri, Lewis and Dickens. Accordingly, those claims are hereby dismissed. See docket no. 78, Declaration of Liora Jacobi, Ex. U.

claims against defendants.[3]  See docket no. 78, Notice of Motion.  For the reasons set forth

below, the defendants' motion for summary judgment is granted in its entirety.


# I.  BACKGROUND[4]

A.    **The Incident**

The undisputed facts are as follows.  On September 6, 2000, plaintiff, a permanent

resident of the United States of Polish descent, and his then-girlfriend, Ladan Raissi, were in an

apartment leased to Raissi, located at 27-10 Newton Avenue, Queens, New York (the

"apartment"), where they both resided at that time of the incident.  It is undisputed that both

plaintiff and Raissi had been consuming alcoholic beverages throughout the night of September

5, 2000 and into the early morning hours of September 6, 2000.  See docket no. 78, Declaration

---

[3]At the time the Notice of Motion and defendants' accompanying motion papers were originally served, plaintiff was represented by counsel, Thomas Sheehan, Esq.  Because plaintiff's counsel subsequently withdrew from this action (see docket no. 33, Minute Entry dated October 18, 2004; docket no. 36, Undated Letter from Tadeasz Danielak to Judge Feuerstein requesting to proceed *pro se*), the Court directed defendants to serve the plaintiff with their motion papers and a Notice to *Pro Se* Litigant Opposing Motion for Summary Judgement, as required by Local Civil Rule 56.2, and file proof of service of the same by a means requiring verification of service on the receiving party.  Defendants so complied.  See docket no. 61, Declaration of Service dated May 26, 2005.  Although plaintiff had submitted an opposition to defendants' motion for summary judgment (see docket no. 38 Affidavit of Tadeasz Danielak, dated November 30, 2004; docket no. 39, Amended Affidavit of Tadeasz Danielak, dated December 22, 2004), the Court permitted plaintiff to submit any additional opposition to defendants' motion, to which plaintiff responded on July 21, 2005 by filing a supplemental reply to defendants' Local Civil Rule 56.1 Statement of Undisputed Facts (docket no. 74), a Memorandum in Opposition to defendants' motion (docket no. 75) and a Supplemental Memorandum in Opposition (docket no. 76).

[4]The undisputed facts are derived from both parties' statements of material facts pursuant to Local Civil Rule 56.1, the accompanying declarations, deposition testimony and other evidentiary material filed in support of and in opposition to defendants' motion for summary judgment.

of Liora Jacobi ("Jacobi Decl."), Ex. I, Transcript of Deposition of Tadeusz Danielak on May 21, 2003 ("Danielak Dep."), at 111-114; see also Jacobi Decl., Ex. J, Transcript of Deposition of Landan Raissi on October 23, 2002 (Raissi Dep."), at 63, li. 13-17.  It is also undisputed that during the early morning hours of September 6, 2000, plaintiff and Raissi got into an argument, during which Raissi asked plaintiff to leave the apartment.  See Danielak Dep. at 116.[5]

Plaintiff claims that during the argument, Raissi became loud and physically violent and repeatedly hit him, although plaintiff denies being injured by Raissi.  Id. at 122-131.  Raissi testified that after she made it clear that she wanted plaintiff to leave, plaintiff "barged" into the bedroom, "walked over to [her] and sat on the bed and took [her] eyeglasses off [her] face and crumpled them in his hands.  He then proceeded to the kitchen to put them in the trash."  Raissi Dep. at 32-33.  Plaintiff admits that he destroyed Raissi's glasses.  See Danielak Dep. at 133.  Raissi also testified that as she was attempting to leave the bedroom, plaintiff struck her on the mouth and pushed her to the floor.  Raissi Dep. at 133.

Although plaintiff denies pushing Raissi (Danielak Dep. at 124, li. 7-8), plaintiff testified that he called 911 for his own safety, as well as for Raissi's safety, because plaintiff thought she might injure herself while hitting him, and plaintiff believed he would be blamed.  Id. at 127-130.  According to the report memorializing plaintiff's call to 911, and as described at

---

[5]The following colloquy during plaintiff's deposition reflects that plaintiff understood that Raissi wanted him to leave the apartment:
  Q:  Did she [Raissi] ever say that she wanted you to leave?
  A:  I think she had.
  Q:  During that night?
  A:  Yes, I think she did.
Danielak Dep. at 116, li. 16-20.

his deposition, plaintiff informed the 911 operator that his girlfriend was beating and attacking him, that he was not injured, and requested that police be sent to their apartment to calm her down.  Id. at 131; see also Jacobi Decl., Ex. G, Sprint Report dated September 6, 2000.  Plaintiff testified that after he called 911, but prior to the police's arrival, Raissi pushed him against a wall and caused his lip to bleed.  Danielak Dep. at 132, li. 6-18.

**B.    The Investigation**

Four police officers, who were subsequently identified as defendants Reilly, Reznick, Fraccalvieri, and Dickens, arrived approximately ten to fifteen minutes after plaintiff called 911.  According to Raissi, when the police arrived, she was exhausted, terrified, upset, and disoriented as a result of her poor, uncorrected vision.  Raissi Dep. 34-35.  Raissi testified that she was "shocked" that plaintiff had called the police complaining that she had hit him.  Id. at 35, li. 3-4.  Raissi also testified that her lip was injured, although she had not seen herself in a mirror.  Before she and plaintiff were separated by the police officers, plaintiff appeared "angry and very inebriated."  Id., li. 18.

It is undisputed that plaintiff invited the officers into the apartment, and that Reilly began questioning him.  Plaintiff explained to Reilly that Raissi hit him because he refused to leave the apartment, but that plaintiff refused to leave because he was not given advance notice of his eviction, which plaintiff believed was required by law.  Danielak Dep. at 141, li. 10-25.  Plaintiff also testified that he pointed out his bleeding lip to Reilly, which was visible, as well as the spot on the wall where his face had allegedly made contact.

Plaintiff further testified that Reilly then left plaintiff with the other officers and,

that he heard Reilly ask Raissi if she wanted "this fucking Polack out of the apartment[,]" referring to plaintiff. Danielak Dep. 143, li. 4-6. According to plaintiff, Dickens then went into Riassi's bedroom, closed the door, and was soon joined in the bedroom by Zenetis,[6] the fifth officer to arrive on the scene, who also closed the door. Plaintiff testified that through the closed door of Raissi's bedroom, he heard Zenetis state in a loud voice "Are you stupid?" and "You have to. You must." Id. at 144, li. 13-21. Plaintiff, however, admits that "[t]hat's all [he] could decipher" because the officers' voices emanating from Raissi's bedroom were "muffled" and that he "[could] not recognize the words." Id. at 144.

Plaintiff further testified that while the other officers were in the bedroom with Raissi, Reznick tried to distract him by talking about his Polish upbringing and engaging him in conversation about Polish food. Plaintiff admits that at the time Reznick was talking to him, plaintiff's body language suggested that he was attempting to move closer to the bedroom in an effort to listen to what was being said inside the bedroom. Id. at 145-46.

Although Raissi indicates in a letter to plaintiff dated January 12, 2001, over four months after the incident, that she felt intimidated by the officers' presence in her bedroom (see docket no. 38, Affidavit of Tadeusz Danielak ("Danielak Aff."), Ex. 1), she testified that she did not feel intimidated by the officers, and that she told the officers that plaintiff had hit her in the face. Raissi Dep. at 37-38. Raissi also told the officers that plaintiff broke her eyeglasses, but does not recall showing them the broken eyeglasses. Id. at 38. Raissi states that her lip was injured, but she does not know if the injury was visible. Id. at 35; see also Jacobi Decl., Ex. K,

_____

[6]Defendant Zanetis was identified as "Kazanikis" at plaintiff's deposition. Presumably, plaintiff was referring to defendant Zanetis.

Domestic Incident Report dated September 6, 2000. Raissi also testified that the officers stayed in the apartment for "quite sometime [sic][,]" although for less than 30 minutes, because plaintiff "was screaming and shouting" and attempting to gain access to the bedroom. Raissi Dep. at 38, li. 11-16.

**C.**     <u>The Arrest</u>

When Reilly came out of the bedroom, he told plaintiff that he was under arrest and he directed Reznick to handcuff him. Danielak Dep. at 148. Plaintiff was then taken to the police precinct by Reznick and Fraccalvieri. <u>Id.</u> at 148-49. The officers did not use force or cause plaintiff to incur any physical injuries. <u>Id.</u> Plaintiff admits that he probably smelled of alcohol and that it was "pretty obvious" he had been drinking, although he never told the officers that he had been drinking. <u>Id.</u> at 155-56.

Plaintiff testified that the officers at the precinct mocked him by mimicking his Polish accent. <u>Id.</u> at 161. Plaintiff, however, denied that any of the arresting officers made any derogatory comments or ethnic slurs about him, other than Reilly's alleged statement at the apartment.

After plaintiff was processed at the precinct, he was taken by officers to Elmhurst Hospital where he was treated for a cut on his lip. <u>Id.</u> at 154-57. At the hospital, plaintiff recalled being handcuffed to his bed where he feel asleep. When plaintiff awoke, he was taken to Queens County Criminal Court where he was to be arraigned. <u>Id.</u> at 160-61.

**D.    The Criminal Proceeding**

Plaintiff was arraigned in Queens County Criminal Court on September 6, 2000, at which time he was charged with assault in the third degree and harassment in the second degree based upon an accusatory instrument and supporting deposition signed by Raissi.  See Jacobi Decl., Ex. M, Criminal Court Complaint and Supporting Deposition of Landan Raissi. Specifically, the accusatory statement alleged that plaintiff punched Raissi in the mouth with a closed fist, causing bleeding, substantial pain, annoyance and alarm.  Id.  Although plaintiff was released on his own recognizance, the court issued a temporary order of protection against him which, among other things, prevented plaintiff from contacting Raissi, entering her home, or coming within one hundred yards of her.  See Jacobi Decl., Ex. Q, Orders of Protection.

On October 26, 2000, the People made a plea offer to plaintiff of harassment in the second degree, community service, and a full order of protection, which plaintiff rejected. See Jacobi Decl., Ex. P, Record of Court Action.  On November 15, 2000, the charge of assault in the third degree was reduced and the same plea offer was made and rejected by plaintiff.  Id. Subsequently, orders of protection were issued on November 15, 2000, December 18, 2000 and January 8, 2001, which prevented plaintiff from going within one hundred yards of Raissi and from assaulting, harassing or threatening her, but allowed communication with her regarding business matters, until February 1, 2001.  See Jacobi Decl., Ex. Q.

In his opposition to defendants' motion, plaintiff claims that from on or about September 10, 2000 through February 2001, Raissi purportedly left numerous messages on plaintiff's answering machine, which plaintiff transcribed and has provided for the Court's review.  See Danielak Aff., Ex. 2.  In one such message purportedly left by Raissi on November

15, 2000, she states (1) that she was disappointed that the criminal case was not dismissed against plaintiff; (2) that she loved and missed plaintiff; (3) that she was scared when the police arrived on the night of the incident because they told her they would arrest her unless she filed charges against plaintiff; (4) that she lied to the police about plaintiff hitting her in the mouth; (5) that she never saw the statement attributed to her in the supporting deposition to the accusatory instrument and that she signed a blank piece of paper; and (6) that she was leaving plaintiff the message to help with his defense.  At her deposition, Raissi testified that before she left this message, plaintiff had called her at work, "frantic" and pleading with her to help him, and then dictated that message to her.  Plaintiff then asked Raissi to leave the message on the answering machine where he was living.  Raissi Dep. at 44-46.

Plaintiff also submits a letter in his opposition to defendants' motion, purportedly written by Raissi, dated January 12, 2001, which provides, *inter alia*, (1) that Raissi was disappointed that the criminal case was not dismissed on January 8, 2001; (2)  that she loved plaintiff and wanted to reconcile with him; (3) that she was writing the letter to convince the judge of plaintiff's innocence; (4) that she was confused, frightened, and intimidated by the police on the day of the arrest; (5) that she essentially signed a blank piece of paper and did not see the statement in the supporting deposition to the accusatory instrument that is attributed to her; and (6) that she never accused plaintiff of punching her in the mouth or of causing swelling and bleeding in her mouth because it was not true.  Danielak Aff, Ex. 1.  At her deposition, Raissi testified that she did not write the letter, in that the letter was dictated to her by plaintiff over the telephone and that she transcribed it verbatim.  Raissi Dep. 55-56.

At her deposition, Raissi explained why she agreed to leave the messages and

write the January 8, 2001 letter:

> Q: Why did you agree to leave this message and write that letter?
>
> A: I was under tremendous emotional duress by him [plaintiff]. There were threats made to me if I wouldn't do this [leave messages; write the letter]. Thinking also the, his own anxiety and worry, constant, constant badgering me to do it. Because of his worry of going to prison or being deported. I gave in and I know what I did was wrong.

Raissi Dep. at 60, li. 15-23.

On February 1, 2001 and February 27, 2001, plaintiff rejected the People's offer of an adjournment in contemplation of dismissal and a limited order of protection. Limited orders of protection were issued on February 1, 2001 and February 27, 2001, which did not prevent plaintiff from coming within any specified distance of Raissi or contacting her. Jacobi Decl., Ex. Q.

On March 20, 2001, the criminal case against plaintiff was dismissed on speedy trial grounds pursuant to N.Y. C.P.L. 30.30 and because Raissi would not cooperate with the People. See Record of Court Action.


# II. DISCUSSION

## A. Summary Judgment Standard

A court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In deciding a motion for summary judgment, the court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party. <u>Flanigan v. Gen. Elec. Co.</u>, 242 F.3d 78, 83 (2d Cir. 2001).

Nevertheless, the nonmoving party cannot rest on "mere allegations or denials" but must instead "set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e); <u>see also</u> <u>Harlen Assocs. v. Inc. Vill. of Mineola</u>, 273 F.3d 494, 499 (2d Cir. 2001) ("[M]ere speculation and conjecture is [sic] insufficient to preclude the granting of the motion."); <u>Nat'l Westminster Bank USA v. Ross</u>, 676 F. Supp. 48, 51 (S.D.N.Y. 1987) ("Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact."). Nor can the nonmoving party rest only on the pleadings. <u>Celotex</u>, 477 U.S. at 324 (stating that Fed. R. Civ. P 56(e) "requires the nonmoving party to go beyond the pleadings"). Instead, each statement of material fact by the movant or opponent must be followed by citation to evidence which would be admissible, as required by Fed. R. Civ. P. 56(e) and Local Civil Rule 56.1(d).

Moreover, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Anderson</u>, 447 U.S. at 247-48 (emphasis in original). No genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [non-moving party's] evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." <u>Id.</u> at 249-50 (citations omitted).

As mentioned above, defendants have served the *pro se* plaintiff with the notice required by Local Civil Rule 56.2, prescribing the manner in which a party must oppose a summary judgment motion. Docket no. 61, Declaration of Service dated May 26, 2005. The Court is mindful of the latitude afforded to a *pro se* party opposing a summary judgment motion. See Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988). Indeed, district courts should "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'" McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). Nevertheless, the Court is also aware that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law[.]" Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983) (quotation marks and citation omitted). Nor does *pro se* status "vitiate the requirement that triable issues of fact must be raised in order to defeat a summary judgment motion." Miller v. New York City Health & Hosp. Corp., No. 00 Civ. 140, 2005 WL 2022016, at *3 (S.D.N.Y. Aug. 22, 2005) (citation omitted).

**B.    <u>False Arrest and False Imprisonment Claims</u>**[7]

Defendants contend that plaintiff's section 1983 and state law claims for false arrest and false imprisonment should be dismissed because there was probable cause for

---

[7]The elements of a false arrest claim under section 1983 are substantially the same as the elements of such a claim under New York law and, thus, the analysis of plaintiff's federal and state claims is identical. See Boyd v. City of New York, 336 F.3d 72, 75 (2d Cir. 2003). In addition, the claims of false arrest and false imprisonment are also essentially the same under both state and federal law and, thus, those claims may be addressed together. See Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995).

plaintiff's arrest.  See docket no. 79, Memorandum of Law in Support of Motion for Summary

Judgment ("Defs.' MOL"), at 3-6.

           "To establish a claim for false arrest under section 1983, a plaintiff must show

that 'the defendant intentionally confined him without his consent and without justification.'"

Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) (citing Weyant v. Okst, 101 F.3d 845, 852

(2d Cir. 1996)).  "The existence of probable cause to arrest the plaintiff constitutes justification

and defeats a claim for false arrest."  Wray v. City of New York, 340 F. Supp. 2d 291, 302

(E.D.N.Y. 2004), *appeal docketed*, No. 04-8028 (2d Cir. Nov. 15, 2004); see also Savino v. City

of New York, 331 F.3d 63, 76 (2d Cir. 2003) (holding that justification for arrest may be

established by showing that the arrest was based on probable cause).  "An officer has probable

cause to arrest when the arresting officer, at the moment of arrest, has 'knowledge or reasonably

trustworthy information of facts and circumstances that are sufficient to warrant a person of

reasonable caution in the belief that the person to be arrested has committed or is committing a

crime.'"  Wray, 340 F. Supp. 2d at 302.  In determining whether probable cause existed at the

moment of arrest, the court must "consider the facts available to the officer at the time of the

arrest."  Ricciuti v. New York City Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997).  Defendants

bear the burden of establishing that probable cause existed for the plaintiff's arrest.  See Savino,

331 F.3d at 76.

           Here, the crucial inquiry concerning plaintiff's false arrest and false imprisonment

claims is not whether plaintiff actually assaulted Raissi, but whether Raissi's statements to the

officers that plaintiff hit her and destroyed her eyeglasses gave the officers probable cause to

believe that plaintiff assaulted her and should be arrested.  See, e.g., Coyle v. Coyle, 354 F. Supp.

2d 207, 211 (E.D.N.Y. 2005) (stating that the crucial inquiry is whether the putative victim's

accusation provided defendants with probable cause to believe that plaintiff committed a crime,

not whether he actually committed a crime); <u>Daniels v. City of New York</u>, No. 03 Civ. 809, 2003

WL 22510379, at * 3 (S.D.N.Y. Nov. 5, 2003) (stating that the question was not whether plaintiff

actually assaulted the putative victim, but whether the victim's accusation provided the officers

with probable cause to believe that the plaintiff had assaulted her).  "Absent circumstances that

raise doubts as to the victim's veracity, . . . an arresting officer may rely on the report of a victim

of a crime."  <u>Coyle</u>, 354 F. Supp. 2d at 212 (citing <u>Curley v. Vill. of Suffern</u>, 268 F.3d 65, 70 (2d

Cir. 2001) ("When information is received from a putative victim or an eyewitness, probable

cause exists, unless the circumstances raise doubt as to the person's veracity.")); <u>see also</u> <u>Singer</u>

<u>v. Fulton County Sheriff</u>, 63 F.3d 110, 119 (2d Cir. 1995); <u>Gentile v. City of New York</u>, No. 01

Civ. 8640, 2003 WL 1872651, at * 2 (S.D.N.Y. Apr. 10, 2003) (an officer may rely on the report

of a victim of a crime to establish probable cause).

Plaintiff has not presented any evidence that the officers had any reason to have

doubted Raissi's statements at the arrest scene.  It is undisputed that Raissi, whom the officers

had no reason to disbelieve, reported the assault to the defendant officers by telling them that

plaintiff had hit her in the face and broken her eyeglasses.[8]  Plaintiff admits it was obvious that

he had been drinking because he smelled of alcohol.  Danielak Dep. at 155-56.  Even assuming

---

[8]Thus, the fact that Raissi swore out a complaint against plaintiff on September 6, 2000, after plaintiff's arrest, is "irrelevant to the probable cause analysis . . . because it occurred after the arrest.  Nor does the delay in obtaining a sworn statement detract from a finding of probable cause, because it is reasonable for police acting in a spontaneous encounter to rely on the seemingly credible statements of a putative victim at the scene of an incident, even without a sworn statement."  <u>Daniels</u>, 2003 WL 22510379, at * 3, n. 4.

that plaintiff did not appear to have been drinking, "[t]o the extent that the officers encountered two people who each appeared credible and who each claimed to be the victim of assault by the other, the police had probable cause to arrest either plaintiff or [Raissi] or both." Daniels, 2003 WL 22510379, at * 3. The officers lawfully decided to accept Raissi's statements, instead of the plaintiff's, when determining that probable cause existed for plaintiff's arrest. See Ricciuti, 124 F.3d at 128 (finding that although the arresting officer would have been entitled to believe the plaintiff's version of events rather than the putative victim's, the officer was not required to do so). Moreover, once a police officer has a reasonable basis for believing there is probable cause to arrest, he is "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." Id. "Information furnished by a single complainant can establish probable cause when the information comes from a victim who provides specific details of a crime." Daniels, 2003 WL 22510379, at * 3.

Because "an apparently reliable complaining victim justifies a reasonable officer's belief that the complainant was assaulted by the person she claims assaulted her," Daniels, 2003 WL 22510379, at * 3, and because plaintiff has failed to establish any reason for the officers to doubt Raissi's statements at the arrest scene, the Court finds that the defendant officers had probable cause to arrest plaintiff. See Gentile, 2003 WL 1872651, at * 2. Accordingly, the Court grants summary judgment in defendants' favor with respect to plaintiff's state and federal false arrest and false imprisonment claims.

## C.     Qualified Immunity From False Arrest and False Imprisonment Claims

Defendants contend that even if there was no probable cause for plaintiff's arrest,

Reilly, Dickens, Lewis, Fraccalvieri and Zanetis are entitled to qualified immunity from plaintiff's false arrest and false imprisonment claims. Defs.' MOL at 10-12. Moreover, defendants also contend that Reznick is entitled to qualified immunity from plaintiff's false arrest and false imprisonment claims because he merely followed instructions from Reilly, his superior, to arrest plaintiff. Id. at 12.

Pursuant to the doctrine of qualified immunity, "a government official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." Mandell v. County of Suffolk, 316 F.3d 368, 385 (2d Cir. 2003). That is, a finding of qualified immunity is appropriate where the defendant did not violate a clearly established right, or where reasonable officers could disagree as to the lawfulness of the defendants' actions. See Cerrone v. Brown, 246 F.3d 194, 202 (2d Cir. 2001); Lee v. Sandberg, 136 F.3d 94, 102 (2d Cir. 1997) (officer's actions in arresting husband for disorderly conduct based on wife's complaint were not objectively unreasonable). The standard is an objective one, and the subjective intention of the officer is irrelevant. Cerrone, 246 F.3d at 202.

The parties here do not dispute that the right to be free from unlawful arrest and imprisonment are clearly established rights. Instead, the parties dispute whether the defendant officers had probable cause to effectuate the arrest of plaintiff. As discussed above, it is well-settled that probable cause for the arrest will defeat claims for false arrest and false imprisonment. See Weyant, 101 F.3d at 852; Wray, 340 F. Supp. 2d at 305; Fox v. City of New York, No. 03 Civ. 2268, 2004 WL 856299, at 11 (S.D.N.Y. Apr. 20, 2004). Accordingly,

because the Court has already determined that probable cause existed for plaintiff's arrest, the defendant officers are entitled to qualified immunity regarding plaintiff's claims for false arrest and false imprisonment.  See Bradley v. Vill. of Greenwood Lake, 376 F. Supp. 2d 528, 534 (S.D.N.Y. 2005).

Assuming, *arguendo*, that the arresting officers did not have probable cause to arrest plaintiff, they would still be entitled to qualified immunity from a suit for damages if there was "arguable probable cause" to arrest the plaintiff.  Escalera, 361 F.3d at 743; Cerrone, 246 F.3d at 202-203.  "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met."  Escalera, 361 F.3d at 743 (internal quotation marks and citations omitted); see also Caldarola v. Calabrese, 298 F.3d 156, 161 (2d Cir. 2002) (holding that the proper inquiry for qualified immunity purposes is whether a reasonable officer could have believed that the specific action taken by the arresting officer was "foreclosed by clearly established law").  Thus, an officer is entitled to qualified immunity even where he or she reasonably, but mistakenly, concluded that probable cause existed for the arrest. Caldarola, 298 F.3d at 162; Ricciuti, 124 F.3d at 127-128; see also Wray, 340 F. Supp. 2d at 301 (stating that an officer is entitled to summary judgment on qualified immunity grounds when a trier of fact would find that reasonable officers could disagree about the legality of the defendant officer's conduct under the circumstances).

Here, even if the defendant officers did not have actual probable cause to arrest plaintiff, it was objectively reasonable for Reilly, Reznick, Zanetis, Lewis, Fraccalvieri and Dickens to believe that plaintiff assaulted Raissi based upon her statements to them that plaintiff

had hit her and broken her eye glasses, and based upon plaintiff's intoxicated state.  See Daniels,

2003 WL 22510379, at * 3.  Alternatively, reasonably competent officers could at least disagree

as to whether the circumstances the defendant officers encountered and investigated in the

apartment were "sufficient to warrant a prudent person to believe" that the plaintiff assaulted

Raissi.  See id.  Therefore, there was at least arguable probable cause for plaintiff's arrest at the

scene and, thus, Reilly, Reznick, Fraccalvieri, Zanetis, Lewis and Dickens are entitled to

qualified immunity from plaintiff's claims for false arrest and false imprisonment.

 In addition, Reznick is entitled to qualified immunity from plaintiff's false arrest

and false imprisonment claims because he followed the direction of Reilly, his superior, to arrest

plaintiff.  See, e.g., Caldarola, 298 F.3d at 166 (finding that an officer who merely followed the

instructions of his superior was entitled to qualified immunity from the plaintiff's false arrest

claims since an officer cannot be expected to question the judgment of his superiors, especially

when he has no basis for doing so).


**D.** **Malicious Prosecution Claims**[9]

 As a preliminary matter, the defendant officers are entitled to qualified immunity

from plaintiff's malicious prosecution claims because once plaintiff was arrested and the matter

was turned over to the Queens County District Attorney's Office, the defendant officers had no

control over the prosecution of plaintiff.  See Wray, 340 F. Supp. 2d at 306 (observing that once

officer had made arrest and turned over the evidence to the assistant district attorney, the officer

---

[9]The elements of a malicious prosecution claim under section 1983 are substantially the same as the elements of such a claim under New York law and, thus, the analysis of plaintiff's federal and state claims for malicious prosecution is identical.  See Boyd, 336 F.3d at 75.

had no control over what evidence was to be used by the district attorney). Plaintiff does not claim that the defendant officers withheld any evidence or information from the District Attorney's Office regarding the circumstances of his arrest.

Moreover, even if plaintiff had named an assistant district attorney in his malicious prosecution claims, those claims would be dismissed because prosecutors have "absolute immunity in connection with the decision whether to commence prosecution." Covington v. City of New York, 916 F. Supp. 282, 287 (S.D.N.Y. 1996); see also Shmueli v. City of New York, No. 03-0287, 2005 WL 2224979, at *4 (2d Cir. Sept. 14, 2005).

In any event, plaintiff cannot prove that there was an absence of probable cause to commence the criminal proceeding against him. To establish a claim for malicious prosecution, the plaintiff must demonstrate: (1) that the defendant initiated a prosecution against him or her; (2) without probable cause to believe that it could succeed; (3) with malice; and (4) that the prosecution terminated in the plaintiff's favor. See Boyd v. City of New York, 336 F.3d 72, 75 (2d Cir. 2003); Savino, 331 F.3d at 72. The parties do not dispute that the first and last elements have been satisfied: a prosecution was initiated against plaintiff, and the prosecution terminated in plaintiff's favor.[10]

As to the second element, a plaintiff cannot establish a malicious prosecution claim if there was probable cause for the prosecution. Boyd, 336 F.3d at 75; see also Savino, 331

---

[10]Plaintiff's prosecution terminated in his favor because both New York law and Second Circuit authority hold that a dismissal of criminal charges pursuant to New York Criminal Procedure Law § 30.30 for speedy trial purposes constitutes a favorable termination. See Golub v. City of New York, 334 F. Supp. 2d 399, 406-407 (S.D.N.Y. 2004); Rogers v. City of Amsterdam, 303 F.3d 155, 160 (2d Cir. 2002) (citing Smith-Hunter v. Harvey, 95 N.Y.2d 191, 195-96 (2000)).

F.3d at 72 (holding that the existence of probable cause is a complete defense to a claim for malicious prosecution).  Probable cause for prosecution exists where the facts and circumstances "would lead a reasonably prudent person to believe the plaintiff guilty."  Boyd, 336 F.3d at 76 (citation omitted); see also Rueda v. Kreth, No. 01 Civ. 2819, 2005 WL 323711, at * 5 (E.D.N.Y. Feb. 7, 2005) (probable cause in the context of malicious prosecution focuses on a belief that criminal charges could be successfully prosecuted).  The determination of probable cause in the context of malicious prosecution is essentially the same as for false arrest, "except that [a claim for malicious prosecution] must be evaluated in light of the facts known or believed at the time the prosecution is initiated, rather than at the time of arrest."  Lovelace v. City of New York, No. 02 Civ. 5398, 2005 WL 552387, at * 2-3 (E.D.N.Y. Mar. 9, 2005) (citation omitted);  Rohman v. New York City Transit Auth., 215 F.3d 208, 215 (2d Cir. 2000) (malicious prosecution under New York law requires lack of probable cause to prosecute); Covington v. City of New York, 171 F.3d 117, 127 (2d Cir. 1999) (malicious prosecution under section 1983 requires lack of probable cause to prosecute).  Because the Court found the existence of probable cause for plaintiff's arrest, plaintiff's malicious prosecution claims must also fail in the absence of evidence that facts came to light that negated probable cause, or from which it could be inferred that the prosecution was commenced out of malice, the third element discussed below.  See Coyle, 354 F. Supp. 2d at 213 (holding that a finding of probable cause to arrest defeats a malicious prosecution claim unless the plaintiff can demonstrate that at some point subsequent to the arrest, additional facts came to light that negated probable cause) (citations omitted).

With respect to the third element, plaintiff has failed to proffer evidence to establish a material factual issue regarding whether he was prosecuted with malice.  Specifically,

the record before the Court is devoid of any evidence that plaintiff was prosecuted with "a wrong or improper motive, something other than a desire to see the ends of justice served." Lovelace, 2005 WL 552387, at *3 (citing Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996)). Accordingly, defendants are entitled to summary judgment dismissing plaintiff's malicious prosecution claims.

### E.    Due Process Claims

Defendants assert, *inter alia*, that plaintiff has failed to set forth any factual basis that would support the finding of a due process violation under section 1983. See Defs.' MOL at 15-17. "[S]ubstantive due process analysis is not available where a more specific constitutional standard is directly applicable." Hickey v. City of New York, No. 01 Civ. 6506, 2004 WL 2724079, at * 18 (S.D.N.Y. Nov. 29, 2004) (citing Graham v. Connor, 490 U.S. 386, 294-395 (1989) (holding that where a particular Constitutional Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims)). Because the Fourth Amendment provides the source for a claim under section 1983 premised upon an alleged unlawful arrest and imprisonment or an allegedly malicious prosecution, plaintiff cannot state a substantive due process claim against defendants. See Murphy v. Lynn, 118 F.3d 938, 944 (2d Cir. 1997); Mayer v. City of New Rochelle, No. 01 Civ. 4443, 2003 WL 21222515, at * 8 (S.D.N.Y. May 27, 2003) (holding that a section 1983 claim of prosecution without probable cause may not be based upon a denial of due process rights, but only upon denial of Fourth Amendment rights); cf. County of Sacramento v. Lewis,

523 U.S. 833, 843 (1998) (holding that substantive due process analysis would be inappropriate if respondents' claim were "covered by" the Fourth Amendment).

Moreover, "[t]he touchstone of due process is protection of the individual against arbitrary action of government." Id. at 845 (internal quotation marks and citation omitted) (brackets in original).  A substantive due process claim is only viable where the government conduct of which the plaintiff complains "shocks the conscience[,]" "violates the decencies of civilized conduct[,]" and was "intended to injure in some way unjustifiable by any government interest[.]" Id. at 846, 849 (citations omitted).

In the instant case, none of the defendants' conduct of which plaintiff complains is egregious enough to state a substantive due process claim, particularly because the defendant officers had probable cause to arrest plaintiff.  See, e.g., Lucky v. City of New York, No. 93 Civ. 1983, 2004 WL 2088557, at * 6 (S.D.N.Y. Sept. 20, 2004) (dismissing plaintiff's substantive due process claim because there was probable cause for plaintiff's arrest).  Defendants are entitled to summary judgment on plaintiff's due process claim, and accordingly, plaintiff's due process claim against defendants is dismissed.


F.      **Equal Protection Claim**

Defendants argue that plaintiff's equal protection claim fails because plaintiff has not alleged that he was treated differently from other similarly situated persons due to his membership in an identifiable or suspect class, and because plaintiff has failed to articulate any purposeful discrimination on the part of defendants.  See Defs.' MOL at 17-18.

"The equal protection clause directs state actors to treat similarly situated people

-22-

alike . . . .  To prove an equal protection violation, claimants must prove purposeful

discrimination, . . . directed at an identifiable or suspect class." Giano v. Senkowski, 54 F.3d

1050, 1057 (2d Cir. 1995) (internal quotation marks and citations omitted).  Plaintiff's equal

protection claim is deficient on its face because it does not allege purposeful discriminatory

treatment because of his membership in a suspect class.  Plaintiff alleges that Reilly asked Raissi

whether she "wanted this 'fucking Pollack' out of the apartment[.]"  Am. Compl. ¶ 13.  Even a

liberal construction of the plaintiff's Amended Complaint cannot overcome the fact that courts

have repeatedly held that a law enforcement officer's use of racial or ethnic slurs or other verbal

abuse does not, without more, violate constitutional rights.  See Signorile v. City of New York,

887 F. Supp. 403, 421 (E.D.N.Y. 1995) (holding that an officer's use of an ethnic slur would not

amount to a constitutional violation); Wright v. Santoro, 714 F. Supp. 665, 667 (S.D.N.Y.), aff'd,

891 F.2d 278 (2d Cir. 1989).

       Moreover, plaintiff's failure to present any evidence establishing a material issue

of fact as to whether he was treated differently from similarly situated individuals is fatal to his

equal protection claim.  See Jackson v. Mann, 196 F.3d 316, 321 (2d Cir. 1999); see also

Caracciola v. City of New York, No. 95 Civ. 3896, 1999 WL 144481, at * 6 (S.D.N.Y. Mar. 17,

1999) (holding that plaintiffs' equal protection claims were frivolous where they failed to allege

that they were members of a protected group, and failed to relate specific instances where other

persons similarly situated were treated differently or where plaintiffs were singled out for

unlawful treatment).  Although plaintiff contends that the purported "bias against people of

Polish descent" caused his arrest, see docket no. 75, Memorandum of Law in Opposition to

Defendants [sic] Motion for Summary Judgment ("Pl. MOL") (citing Tennessee Williams, A

Streetcar Named Desire (1947)), plaintiff has nevertheless failed to present any competent evidence of any alleged unequal treatment. Allegations contained in memoranda of law are not "competent evidence" raising a genuine issue of material fact for purposes of a summary judgment motion. See Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 526 (2d Cir. 1994). Accordingly, the Court grants summary judgment in defendants' favor on plaintiff's equal protection claim because plaintiff has failed to allege or present evidence establishing a material factual dispute as to whether he was treated differently from other similarly situated persons due to his membership in an identifiable or suspect class.

## G.    Conspiracy Claims

Defendants contend that plaintiff's allegations of conspiracy are insufficient to state a claim under 42 U.S.C. § 1985.[11] See Defs.' MOL at 13-15. In addition, defendants contend that plaintiff cannot state a conspiracy claim against defendants because they are all employees of a single entity, the New York City Police Department. Id. at 15.

To establish a claim of conspiracy under section 1985, a plaintiff must show (1) a conspiracy between the defendants, (2) for the purpose of depriving him of equal protection of the laws or of equal privileges and immunities, and (3) an act taken in furtherance of the conspiracy, (4) which caused the plaintiff injury. See Thomas v. Roach, 165 F.3d 137, 146 (2d

---

[11]Although plaintiff's Amended Complaint does not specify the specific statutory provision as the basis for his conspiracy claim, a conspiracy claim under 42 U.S.C. § 1983 "should . . . be stated as a claim under [s]ection 1985, which applies specifically to conspiracies." Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003); Scott v. Goord, No. 01 Civ. 847, 2004 WL 2403853, at * 12 (S.D.N.Y. 2004). Accordingly, the Court will examine plaintiff's conspiracy claim under 42 U.S.C. § 1985 ("section 1985").

Cir. 1999) (citations omitted). Plaintiff must establish that the conspiracy was "motivated by some racial or . . . otherwise class-based, invidious discriminatory animus behind the conspirators' action." Id.

Here, plaintiff has failed to establish any issue to be tried regarding such discriminatory animus behind his arrest and, thus, his conspiracy claims must fail for that reason. See, e.g., Scott v. Goord, No. 01 Civ. 847, 2004 WL 2403853, at * 13 (S.D.N.Y. 2004) (finding summary judgment "appropriate because [p]laintiff . . . failed to proffer any evidence from which a reasonable fact finder could conclude that a class-based animus motivated [d]efendants' alleged [conspiratorial conduct]."

Moreover, there is no evidence of any unlawful agreement or conspiracy. Conclusory allegations of defendants' alleged participation in a conspiracy are insufficient to support a section 1985 claim. Johnson v. City of New York, No. 01 Civ. 1860, 2004 WL 502929, at * 5 (E.D.N.Y. Jan. 12, 2004). Indeed, the Court's finding that plaintiff's arrest and subsequent prosecution were based on probable cause undermines plaintiff's allegation that the defendants conspired to unlawfully arrest, imprison and prosecute plaintiff. Consequently, the Court further finds that plaintiff's conspiracy claims are without merit.

In any event, plaintiff's conspiracy claims are barred by the "intra-corporate conspiracy" doctrine. The "intra-corporate conspiracy" doctrine, sometimes called the "intra-enterprise conspiracy" doctrine, provides that a corporation or public entity "generally cannot conspire with its employees or agents as all are considered a single entity." Everson v. New York City Transit Auth., 216 F. Supp. 2d 71, 76 (E.D.N.Y. 2002) (citation omitted); see also Quinn v. Nassau County Police Dep't, 53 F. Supp. 2d 347, 359 (E.D.N.Y. 1999). An exception

to the intra-corporate conspiracy doctrine applies where a plaintiff "adequately alleges that each defendant possessed an independent, personal conspiratorial purpose," that is, a "personal stake," wholly separate and apart from the entity.  <u>Everson</u>, 216 F. Supp. 2d at 76 (citation omitted); <u>see also</u> <u>Girard v. 94th St. and Fifth Ave. Corp.</u>, 530 F.2d 66, 71-72 (2d Cir. 1976).  Whether the doctrine applies depends upon whether each defendant was acting in furtherance of the municipality's interests, or whether their conduct was motivated by a personal interest.  <u>Quinn</u>, 53 F. Supp. 2d at 360.  Personal bias or prejudice alone, however, does not support application of the exception; rather there must be some other personal interest or stake alleged on the part of the individual defendants.  See <u>Salgado v. City of New York</u>, 00 Civ. 3667, 2001 WL 290051, at * 8 (S.D.N.Y. Mar. 26, 2001); <u>Johnson v. Nyack Hosp.</u>, 954 F. Supp. 717, 723 (S.D.N.Y. 1997).

Here, the intra-corporate conspiracy doctrine bars plaintiff's conspiracy claims because all of the individual defendants were employees of the New York City Police Department, and were acting within the scope of their employment as police officers when they arrested plaintiff.  <u>See, e.g.</u>, <u>Scott</u>, 2004 WL 2403853, at *13 (finding that plaintiff's conspiracy claim failed because alleged co-conspirators were all employees of defendant New York State Department of Correctional Services, acting within the scope of their employment, when they allegedly violated plaintiff's rights).  Moreover, with respect to the so-called "personal stake" exception to the intra-corporate conspiracy doctrine, plaintiff has not established, or even alleged, that any of the individual defendants possessed an independent, personal conspiratorial purpose or interest in plaintiff's arrest wholly separate and apart from the New York City Police Department.  Accordingly, the Court grants summary judgment in defendants' favor dismissing the conspiracy claims against all defendants.

**H.      Monell Claim**

A municipality may only be liable for constitutional claims under section 1983 if the alleged offending conduct was undertaken pursuant to "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipal] officers[,] . . . [or] governmental 'custom' even though such a custom has not received formal approval through the . . . [municipality's] official decisionmaking [sic] channels." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690 (1978); Patterson v. County of Oneida, 375 F.3d 206, 226 (2d Cir. 2004). In addition, it is well-settled that municipal liability under section 1983 cannot be based on a theory of *respondeat superior*. See, e.g., Goldberg v. Town of Rocky Hill, 973 F.2d 70, 72 (2d Cir. 1992); Monell, 436 U.S. at 690-91.

To establish the existence of a municipal policy or custom, the plaintiff must allege: (1) the existence of a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to "deliberate indifference" to the rights of those who come in contact with the municipal employees. Moray v. City of Yonkers, 924 F. Supp. 8, 12 (S.D.N.Y. 1996); Davis v. Lynbrook Police Dep't, 224 F. Supp. 2d 463, 478 (E.D.N.Y. 2002).

In the instant case, the record is devoid of any facts that would indicate the existence of any policies, practices or customs, formal or otherwise, or acts that may fairly be

said to represent official policy, which deprived plaintiff of a constitutional right. Accordingly, the Court grants summary judgment in defendants' favor on plaintiff's <u>Monell</u> claim. <u>See</u> <u>Hazan v. City of New York</u>, No. 98 Civ. 1716, 1999 WL 493352, at * 2 (S.D.N.Y. Jul. 12, 1999) (dismissing plaintiff's <u>Monell</u> claim against the City due to plaintiff's failure to allege the existence of any governmental custom or policy which deprived plaintiff of a constitutional right).

Because any municipal claim against the City must be predicated on a constitutional violation, and because the Court has found that there was no false arrest, false imprisonment, malicious prosecution, due process or equal protection violation or conspiracy, the City is entitled to summary judgment dismissing any remaining section 1983 claims against it. <u>See, e.g.</u>, <u>Coyle</u>, 354 F. Supp. 2d at 214 (finding that there can be no cognizable claim against the municipal defendants since plaintiff had not sufficiently alleged that his constitutional rights were violated); <u>Daniels</u>, 2003 WL 22510379, at *4 (dismissing false arrest claims against the City for failure to state a claim where there was probable cause for the plaintiff's arrest); <u>Gentile</u>, 2003 WL 1872651, at *2 (dismissing claims against the City where plaintiff's false arrest and malicious prosecution claims were dismissed against the individual officer); <u>Mayer</u>, 2003 WL 21222515, at *8 (finding that the City could not be held liable where there was no underlying constitutional violation). To the extent that plaintiff's claims against the City rely on the statement Reilly purportedly made to Raissi referring to plaintiff as a "fucking Polack," as discussed above, such a statement, without more, is not a constitutional violation for purposes of section 1983 liability. <u>See, e.g.</u>, <u>Hazan</u>, 1999 WL 493352, at * 2 (finding that statements reflecting racial or national origin prejudice, although reprehensible, are not sufficient to state a

constitutional violation under section 1983).

## I.    **Failure to Intervene Claims**

"A police officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." Ricciuti, 124 F.3d at 129 (internal quotation marks and citation omitted).  An officer, however, cannot be found liable under section 1983 for failure to intervene unless (1) "such failure permitted fellow officers to violate a suspect's clearly established statutory or constitutional rights of which a reasonable person would have known[,]" and (2) the failure to intervene was "under circumstances making it objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights." Id. (internal quotation marks and citations omitted). Moreover, summary judgment on qualified immunity grounds in connection with a claim for failure to intervene to prevent an illegal arrest is appropriate where the defendant shows "that the only result a fair jury could reach is that reasonably competent police officers, faced with the information available to the non-intervening officer at the time of the arrest, could disagree about the legality of the arrest." Id. (citation omitted).

Because the Court determined that the undisputed factual record establishes that there was at least "arguable" probable cause for plaintiff's arrest, no rational jury could find that it was objectively unreasonable for the defendant officers to believe that plaintiff's arrest was unlawful.  Accordingly, the defendant officers are entitled to summary judgment dismissing plaintiff's failure to intervene claims, and are also entitled to summary judgment on qualified immunity grounds for that reason.

Moreover, there must exist a colorable claim of an underlying constitutional violation before a plaintiff may state a viable failure to intervene claim. See Hickey, 2004 WL 2724079, at * 17. Because the Court has dismissed plaintiff's false arrest, false imprisonment, malicious prosecution, due process, equal protection, conspiracy and Monell claims, there are no claims of a constitutional violation upon which to base a failure to intervene claim. See, e.g., Lucky, 2004 WL 2088557, at * 7 (finding that plaintiff's failure to intervene claim was defeated where defendants demonstrated that there was probable cause for his arrest and prosecution). Accordingly, summary judgment dismissing plaintiff's failure to intervene claims is appropriate.

**J.** **State Law Claims**

1. Supplemental Jurisdiction

This Court's jurisdiction over plaintiff's state law claims is supplemental because there is no diversity of citizenship between the parties. See 28 U.S.C. § 1367(c)(3); Valencia ex rel. Franco v. Lee, 316 F.3d 299, 304 (2d Cir. 2003). Pursuant to 28 U.S.C. § 1367(c), a court "may decline to exercise supplemental jurisdiction[.]" See also United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966) (stating that the pendent form of supplemental jurisdiction is a "doctrine of discretion"). "[I]f it appears that the state issues substantially predominate . . . the state claims may be dismissed without prejudice and left for resolution to state tribunals." Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001) (citing Gibbs, 383 U.S. at 726-727). Moreover, if the state issues involve novel questions of state law, the court should decline to exercise supplemental jurisdiction over those claims once all federal claims have been dismissed. See Raucci v. Town of Rotterdam, 902 F.2d 1050, 1054 (2d Cir.

1990); Stuevecke v. New York Hosp. Med. Ctr. of Queens, No. 01 Civ. 326, 2003 WL 22019073, at *6 (E.D.N.Y. Aug. 26, 2003)).

The dismissal of state law claims, however, is not always required when the federal claims in an action are dismissed.  See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350, n. 7 (1988); Raucci, 902 F.2d at 1054.  Rather, the court must "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction" over the pendent claims.  Cohill, 484 U.S. at 350; see also Raucci, 902 F.2d at 1054.

In the "usual case" in which all federal claims are dismissed before trial, "the balance of factors to be considered . . . will point toward declining to exercise jurisdiction" over the pendent claims.  Cohill, 484 U.S. at 350, n. 7; see also Barriera v. Bankers Trust, 98 Civ. 3641, 2003 WL 22387099, at * 9 (S.D.N.Y. Oct. 20, 2003).  Nevertheless, some courts have held that the completion of discovery, the determination of dispositive motions, and the trial readiness of the case may favor retaining jurisdiction over the pendent claims even after dismissal of the federal claims, particularly where the state law issues are well-settled.  See, e.g., Raucci, 902 F.2d at 1055; Chimarev v. TD Waterhouse Investor Servs., Inc., 280 F. Supp. 2d 208, 226 (S.D.N.Y. 2003) (holding that judicial economy warranted exercising supplemental jurisdiction over state law claims where discovery had been completed and motions made with respect to all of plaintiff's claims); Clerge v. Consol. Edison, 95 Civ. 9072, 1999 WL 239688, at * 6 (S.D.N.Y. Apr. 23, 1999) (judicial economy and fairness warranted the court's exercise of supplemental jurisdiction over plaintiff's intentional infliction of emotional distress claim where no novel questions of state law were presented and the case was filed almost four years earlier,

discovery had been completed, and the court had become fully familiar with the facts and issued raised).

In the interest of judicial economy, and because no novel questions of state law are presented by the instant case, the Court will exercise supplemental jurisdiction over plaintiff's state law claims. For the reasons set forth below, plaintiff's state law claims are dismissed.

2.     Negligent Training, Retention and Supervision

Because it is undisputed that the defendant officers were employed by the City and were acting within the scope of their employment when they arrested plaintiff, plaintiff's claims for negligent training, retention and supervision fail as a matter of law. See, e.g., Kramer v. City of New York, No. 04 Civ. 106, 2004 WL 2429811, at * 12 (stating that "[w]hen an employee is acting within the scope of her employment, her employer may be held liable for the employee's negligence only under a theory of *respondeat superior*, and no claim may proceed against the employer for negligent hiring or retention.") (quoting Colodney v. Continuum Health Partners, Inc., No. 03 Civ. 7276, 2004 WL 829158 at *9 (S.D.N.Y. Apr. 15, 2004)); Griffin v. City of New York, 287 F. Supp. 2d 392, 397-98 (S.D.N.Y. 2003) (accord). Accordingly, the Court grants summary judgment in defendants' favor dismissing plaintiff's claims of negligent training, retention and supervision.

3.     Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress under New

York law, the plaintiff must show (1) extreme and outrageous conduct; (2) done with the intent to cause, or with reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. Kramer, 2004 WL 2429811, at * 9 (citation omitted); see also Hazan, 1999 WL 493352, at * 7 (holding that in order to support a claim for intentional infliction of emotional distress under New York law, a plaintiff must prove conduct that transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society).

In the instant case, other than plaintiff's bald assertion that defendants intentionally inflicted emotional distress on him, there is absolutely no evidence from which "a fair-minded trier of fact could reasonably conclude that the conduct of these defendants constitutes either extreme or outrageous conduct." Kramer, 2004 WL 2429811, at * 9. The Court finds that the record lacks any evidence "even remotely satisfying this rigorous threshold and upon which a rational fact-finder could find liability" for intentional infliction of emotional distress. Id. In any event, "public policy prohibits recovery for claims of intentional infliction of emotional distress against the City . . . ." See Hazan, 1999 WL 493352, at * 7 (citing Lauer v. City of New York, 659 N.Y.S.2d 57, 58 (App. Div. 1997)). Accordingly, the Court grants summary judgment in defendants' favor dismissing plaintiff's claim for intentional infliction of emotional distress.


4.      Negligent Infliction of Emotional Distress

Although plaintiff's Amended Complaint does not specifically claim that defendants negligently inflicted emotional distress on plaintiff, the Court will nevertheless

address this issue insofar as plaintiff's Amended Complaint alleges that plaintiff suffered "injuries . . . by reason of the negligence of defendants . . . ." Am. Compl. ¶ 31, 36.

To establish a claim for negligent infliction of emotional distress under New York law, a plaintiff must demonstrate either (1) that he or she was threatened with physical harm as a result of the defendant's negligence and he or she suffered emotional injury from witnessing the death or serious bodily injury of a member of his or her immediate family (known as the "bystander" theory); or (2) that he or she suffered an emotional injury from the defendant's breach of a direct duty owed to the plaintiff which unreasonably endangered his or her own physical safety (known as the "direct duty" theory). See Mortise v. United States, 102 F.3d 693, 696 (2d Cir. 1996). Because plaintiff has not established that his physical safety was ever threatened or endangered by defendants, he cannot recover under either theory. Accordingly, to the extent plaintiff raises a claim for negligent infliction of emotional distress, summary judgment is granted in defendants' favor dismissing that claim.

5. Invasion of Privacy

Plaintiff's invasion of privacy claim is presumably based upon the defendant officers' alleged unlawful entrance into Raissi's apartment, where he resided, and plaintiff's subsequent arrest therein. Plaintiff, however, concedes that he called the police and "invited" the defendant officers into the apartment. Danielak Dep. at 140-41. In other words, the defendant officers' entry into the apartment was made on a "reasonable belief of consent to enter the apartment by a person with actual authority to grant such consent." Kramer, 2004 WL 2429811, at * 9. Without an underlying Fourth Amendment violation in the manner of his arrest or the

entry into the apartment, defendants did not violate plaintiff's reasonable expectations of privacy.

See id. (dismissing plaintiff's invasion of privacy claim where there was no Fourth Amendment violation in the manner of her arrest or the entry into her apartment).  Accordingly, the Court grants summary judgment in defendants' favor dismissing plaintiff's invasion of privacy claim.


## III.  CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety, and the Amended Complaint is hereby dismissed.  The Clerk of the Court is directed to enter judgment in defendants' favor and close this case.


Dated:  September 26, 2005
      Brooklyn, New York

                                    _____/s/_____
                                      **Kiyo A. Matsumoto**
                                      United States Magistrate Judge
                                      Eastern District of New York

**SERVICE LIST:**

Plaintiff *(via overnight delivery)*
Defendants *(via Electronic Case Filing)*